IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
LEWIS T. BABCOCK, JUDGE

Civil Case No.  12-cv-00313-LTB

FARMER OIL AND GAS PROPERTIES, LLC, an Arizona limited liability company,

       Plaintiff,

v.

SOUTHERN UTE INDIAN TRIBE,

       Defendant.

_____

MEMORANDUM OPINION AND ORDER
_____

Babcock, J.

This matter is before me on Defendant Southern Ute Indian Tribe's (the "Tribe") Motion to Dismiss for Lack of Subject Matter Jurisdiction Pursuant to Fed. R. Civ. P. 12(b)(1) **[Doc # 16]**. After considering the parties' arguments, for the reasons below, I GRANT the motion.

## I. Background

Plaintiff Farmer Oil and Gas Properties, LLC ("Farmer"), is an Arizona limited liability company. The Tribe is a federally-recognized Indian tribe organized pursuant to the Indian Reorganization Act of 1943, 25 U.S.C. §§ 461-479, occupying a reservation in southwestern Colorado. Its reservation is "a checkerboard" of lands owned by the United States in trust for the Tribe, interests held by the Tribe, and interests held in fee by non-Indians. *Southern Ute Indian Tribe v. Amoco Prod. Co.*, 874 F.Supp.1142, 1151 (D. Colo. 1995).

This case concerns the disputed ownership of the oil and gas estate beneath a certain 80-acre parcel of land within the Tribe's reservation located in the S/2SW/4 of Section 35, Township 33 North, Range 11 West, N.M.P.M., La Plata County Colorado (the "80-Acre Tract"). Specifically,

the case involves the ownership of the coalbed methane gas ("CBM gas") underlying that tract. It is uncontroverted that the Tribe owns the surface estate to all of Section 35, including the 80-Acre Tract.  It is also uncontroverted that the Tribe owns the entire subsurface estate of Section 35, except for, of course, the oil and gas estate underlying the 80-Acre Tract. Farmer contends that it and not the Tribe owns the 80-Acre Tract's oil and gas estate. The parties do not dispute that the CBM gas is one stick in the oil and gas estate ownership bundle.  Considerable additional background is necessary to couch and evaluate the instant motion, beginning with the disposition of the 80-Acre Tract. The facts below are undisputed unless otherwise noted.

## A

The 80-Acre Tract was originally part of a homestead patent issued under the Coal Lands Act of 1910.  That patent transferred the 80-Acre Tract to Lewis H. Underwood, but it reserved the tract's coal estate in the United States.

On May 27, 1946, the presumed successors to Underwood–Raymond, Olive, and Laura Farmer–issued a warranty deed to John C. Cameron conveying approximately 2,440 acres of land within the Tribe's reservation, land which included the 80-Acre Tract (the "Cameron Deed"). The Cameron Deed, however, reserved

> all minerals including oil, gas and carbonaceous minerals together with the right to prospect for, mine and remove the same, for a period of twenty years at which time such reservations shall terminate unless minerals are being produced from said land at the end of twenty years, in which event said reservations shall continue during production.

First Am. Compl. at ¶ 14.  Farmer asserts that when Raymond, Olive, and Laura Farmer executed the Cameron Deed, they owned the 80-Acre Tract's oil, gas, and mineral estate (save the coal, which had been reserved to the United States in patents for those lands, as explained *infra*).

Next, on July 8, 1946, John Cameron and his wife conveyed all their right, title, and interest to the lands contained in the Cameron Deed to "the United States of America in trust for the Southern Ute Tribe."  The deed that Cameron and his wife issued to the United States did not contain a reservation, nor did it mention the mineral reservation contained in the Cameron Deed.

**B**

Fast forward to 1991. That year the Tribe sued those claiming an ownership interest in CBM gas contained in coal strata underlying lands within the Tribe's reservation which had previously been reserved in the federal government under the Coal Lands Acts of 1909 and 1910 ("the Coal Lands Acts"). *Amoco*, 874 F.Supp. at 1146. The defendants included Amoco Production Company, other oil companies, and individuals, including Farmer's predecessor in interest. *Id*. The Tribe sought a declaration that it owned the CBM gas underneath the land at issue, land which the parties agree included the 80-Acre Tract. *Id.* It argued that Congress's reservation of "coal" in the Coal Lands Acts also reserved the CBM gas.  Therefore, when the United States restored the coal to the Tribe in 1938 pursuant to the Order of Restoration, see 3 Fed. Reg. 1425 (Sept. 14, 1928), it restored the CBM gas too. *Id* at 1151. The "central question" in *Amoco* was "whether Congress included CBM gas in its reservation of 'coal' under the Coal Lands Acts." *Id.* at 1151, 1146.

On June 23, 1993, during the pendency of *Amoco*, the Tribe entered into a settlement agreement (the "PSA") with Palo Petroleum, Inc. ("Palo"), one of the defendants in *Amoco*. *See* First Am. Compl. Ex. 1, Palo Settlement Agreement (hereinafter cited as "PSA") at 1, Recitals. Palo was mining and intended to mine minerals on certain lands within the Tribe's reservation pursuant to leases from private owners and operating companies.  The PSA's purpose was to insulate Palo from the risk that the Tribe could obtain a favorable decision in *Amoco*.  Farmer's predecessor-in-

3

interest ratified the PSA by executing a ratification agreement (the "Ratification").  On August 6, 1993, I approved the PSA and dismissed all of the Tribe's claims against Palo with prejudice. The *Amoco* case proceeded against the rest of the defendant-class.

On February 5, 1995, *nunc pro tunc* to September 13, 1994, I held that Congress's reservation of coal in the Coal Lands Acts did not include a reservation of CBM gas.  *Id.* at 1152. "Consequently, title to CBM gas in the lands at issue [in *Amoco*] was conveyed by United States patents issued to homesteaders under the 1909 and 1910 Acts upon surplus lands on the Tribe's reservation."  *Id.* I therefore determined that the Tribe acquired no title to CBM gas in 1938 when the United States restored the coal to the Tribe.  *Id.*  The Supreme Court affirmed my ruling. *See Amoco Prod. Co. v. Southern Ute Indian Tribe*, 526 U.S. 865 (1999).  By order dated March 22, 2000, on remand from the Supreme Court, I dismissed all of the Tribe's remaining claims unresolved by my prior order.  This closed *Amoco*.

## C

The next background event occurred in 2010. That year the Tribe intervened in a lawsuit filed in Southern Ute Indian Tribal Court styled *Three Stars Production Company, LLC v. BP America Production Company*, Cause No. 2010 CV 36.  As an affirmative defense in that action, the Tribe asserted that it has owned the 80-Acre Tract's oil and gas estate, including the CBM gas therein, since May 27, 1966, on the theory that the terminable mineral interest in the Cameron Deed reverted to the Tribe on that date due to non-production. The case was ultimately dismissed because Three Stars could not join the United States, which the Tribal Court determined was an indispensable party.

Three Stars then filed suit in this Court. *See Three Starts Production Company, LLC v. BP*

*America Production Company*, Case No. 11-cv-1162-WYD-MUW.  That case is pending before Chief Judge Daniel.  There, BP filed a motion to dismiss Three Stars's complaint.  *See id.*, Doc ##10, 16.  Based on the ownership claim that the Tribe asserted in Three Stars's case in Tribal Court, BP argued in its motion that the Tribe was the owner of 80-Acre Tract's mineral estate and, as such, that Three Stars had failed to join the Tribe as an indispensable party.  The court granted BP's motion, although it did not decide the merits of BP's assertion regarding the Tribe's ownership claim.  *See id.*, Doc #42 at 8.  ("[C]oncerning BP's claim that the 80 mineral acres reverted back to the Tribe prior to Three Stars obtaining leases to those lands, the merits of the claim are irrelevant at this stage of the litigation. Rule 19 is concerned with 'claimed' interests; '[t]he underlying merits of the litigation are irrelevant' to the Rule 19 inquiry unless the claimed interest is 'patently frivolous.'  Because the Tribe asserted title to the minerals under the subject acres in the previous action before the Tribal Court, and as I do not find these claims to be frivolous, I conclude that the Tribe has an interest in the subject mineral acres, and that the Tribe's ability to protect that interest could be impaired if this action was disposed of in the Tribe's absence.") (internal citations omitted).  The court also noted that the Tribe enjoys sovereign immunity.  *Id.* at 12 (Given that the Tribe . . . enjoy[s] sovereign immunity, . . .").

## D

After learning of the Tribe's asserted ownership of the 80-Acre Tract's oil and gas estate in the *Three Stars* cases, Farmer filed this suit.  Farmer alleges that the terminable mineral estate in the Cameron Deed has been perpetuated by the production of oil or gas on lands subject to the deed's mineral reservation.  It further alleges that it has succeeded to an undivided 78.5714286% terminable mineral interest in the 80-Acre Tract's oil and gas estate and that the Tribe has no interest therein.

Farmer brings three claims for relief. The first seeks a declaratory judgment that my ruling in *Amoco* held that the Tribe did not own the 80-Acre Tract's CBM gas as of March 22, 2000. The second asks for a declaratory judgment that the Tribe's claimed ownership of the CBM gas underneath the 80-Acre Tract is without merit and frivolous. The third is a declaratory judgment in favor of Farmer that in the PSA and Ratification, the Tribe agreed to communitize the 80-Acre Tract's CBM gas with the adjacent 240-acre parcel of Tribe minerals. Farmer asserts that this case presents a federal question and that jurisdiction therefore exists under 28 U.S.C. § 1331.

The Tribe now moves pursuant to Fed. R. Civ. P. 12(b)(1) to dismiss Farmer's suit for lack of jurisdiction. Its primary contention is that it has sovereign immunity from the action. The Tribe further argues that neither federal question nor ancillary jurisdiction exists.

## II. Standard of Review

Before addressing the substance of the Tribe's motion, I must determine the standard of review. *See Holt v. U.S.*, 46 F.3d 1000, 1002 (10th Cir. 1995); *Hall v. Bellmon*, 935 F.2d 1106 (10th Cir. 1991). "Tribal sovereign immunity is a matter of subject matter jurisdiction, which may be challenged by a motion to dismiss under Fed. R. Civ. P. 12(b)(1) . . . ." *E.F.W. v. St. Stephen's Mission Indian High School*, 264 F.3d 1297, 1302-03 (10th Cir. 2001) (internal citations omitted).

A Rule 12(b)(1) motion generally takes one of two forms. "First, a party may make a facial challenge to the plaintiff's allegations concerning subject matter jurisdiction, thereby questioning the sufficiency of the complaint." *Id.* at 1303. When addressing a facial attack, I must accept the allegations in the complaint as true. *Id.* "Second, a party may go beyond allegations contained in the complaint and challenge the facts upon which subject matter jurisdiction depends." *Id.* (quoting *Holt*, 46 F.3d at 1003). When addressing a factual attack, I do not presume the truthfulness of the

complaint's factual allegations, and I have "wide discretion to allow affidavits, other documents, and a limited evidentiary hearing to resolve disputed jurisdictional facts under Rule 12(b)(1)." *Id.* (quoting *Holt*, 46 F.3d at 1003). Where evidence outside of the pleadings is considered, the motion is not converted to a motion for summary judgment under Fed. R. Civ. P. 56. *Holt*, 46 F.3d at 1003. A court, however, must convert a Rule 12(b)(1) motion into a Rule 12(b)(6) or Rule 56 motion when resolution of the jurisdictional question is intertwined with the merits of the case. *Id.* This occurs when "subject matter jurisdiction is dependent on the same statute which provides the substantive claim in the case." *Id.* Importantly, when subject matter jurisdiction is challenged, the party asserting the existence of jurisdiction–here, Farmer–nevertheless has the burden of establishing that such jurisdiction exists. *Montoya v. Chao*, 296 F.3d 952, 955 (10th Cir. 2002).

In its complaint, Farmer cites *Amoco* and makes certain allegations concerning the case. The complaint further contains allegations regarding the PSA and Ratification and attaches both. One of those allegations is that the PSA required the Tribe to communitize the 80-Acre Tract with adjacent tracts subject to the PSA. First Am. Compl. at ¶ 5. In its response, Farmer relies on materials beyond the complaint and its exhibits to aver that the Tribe agreed to communitize that tract as part of other agreements extraneous to the PSA. *See* Pl.'s Resp. at 22-25.

The Tribe disputes the complaint's allegations concerning *Amoco*'s scope, citing and quoting the case and its pleadings to do so. The Tribe also disputes the scope and text of the PSA and Ratification as they were alleged in the complaint. *See, e.g.*, Def.'s Mot. at 15 ("Clearly, nothing in the [PSA] obligated the Tribe to consent to communitize its other acreage in Section 35 with the 80-Acre Tract."). Additionally, both parties have submitted additional evidence beyond the pleadings concerning  communitization of the 80-Acre Tract. *See, e.g.*, Pl.'s Resp. Ex. 9 and 10,

Def.'s Reply at 12-14. Together, this strongly suggests a factual attack. *See E.F.W.*, 264 F.3d at 1303 n.2. Farmer agrees. *See* Pl.'s Resp. at 6 ("The Tribe, however, mounts a factual attack on this claim . . . ."). I therefore construe the Tribe's motion accordingly and consider matters beyond the allegations in Farmer's complaint. *See Holt*, 46 F.3d at 1003. The Tribe's motion need not be converted to a Rule 12(b)(6) or Rule 56 motion because resolving it is not intertwined with the merits of the case. Here, the jurisdictional question turns on whether the Tribe has sovereign immunity from this suit and, if it does not, whether federal question or ancillary jurisdiction exists under 28 U.S.C. § 1331 or 1367, respectively. None of these, however, provide the basis for Farmer's claims. *See, e.g.*, *Wheeler v. Hurdman*, 825 F.2d 257, 259 (10th Cir. 1987) ("Courts have invoked this rule when subject matter jurisdiction has turned on whether a particular investment was a 'security' under the federal securities statutes."); *see also Clark v. Tarrant Cnty*, 798 F.2d 736, 742 (5th Cir. 1986) (finding subject matter jurisdiction question and merits intertwined because the federal statute, Title VII, both conveys jurisdiction and creates a cause of action, and determination of both turned on whether defendant was an "employer" thereunder). Farmer does not argue otherwise.

### III. Discussion

A review of the briefs shows that this motion hinges on two issues: First, does Farmer's instant action fall within *Amoco*'s scope? Second, does it fall within the PSA's scope? The Tribe answers no to both, Farmer yes to both. Because the parties' various arguments are predicated upon their competing answers to these two issues, for clarity and brevity, I address these issues first.

I agree with the Tribe that this action falls outside the scope of both *Amoco* and the PSA. Armed with these determinations, I then turn to the parties' specific arguments. Insodoing, I

8

conclude that Farmer has failed to establish that I have subject matter jurisdiction over its claims. To be clear, I note that I do not touch upon the merits of the ownership dispute at the heart of this case–to wit, I do not consider or decide whether Farmer or the Tribe owns title to the 80-Acre Tract's oil and gas estate. Rather, I focus solely upon whether I have jurisdiction to even hear this dispute.

**A**

**1**

I begin by surveying *Amoco* to see whether the instant action falls within its territory. In *Amoco*, the Tribe sought to quiet title only to the "beneficial interest in the coal" and to all "constituent, inherent and integral components" of reserved coal, not to the larger oil and gas estate underlying the lands at issue. *See* Pl.'s Reply Ex. 2, Tribe's First Am. Compl. at 16, ¶¶ 2, 3. *Amoco* did not later expand to involve or decide any and all sources of claimed ownership over the CBM gas. *See* 874 F.Supp. 1142. It instead examined only ownership allegedly deriving from a very particular source: coal that was reserved in and by the United States in patents issued under the Coal Lands Acts and which was later restored to the Tribe in 1938. *See id.* Furthermore, *Amoco* decided competing ownership claims from a discrete, identified number of purported owners. *See id.* The case expressly reflects these tight contours:

> The central question in this case is whether Congress included CBM gas in its reservation to the United States of "coal" under the Coal Lands Acts of 1909 and 1910. I hold that, as a matter of law, Congress' reservation of coal in the United States in the Acts of 1909 and 1910 did not include reservation of CBM gas. Consequently, title to CBM gas in the lands at issue here was conveyed by United States patents issued to homesteaders under the 1909 and 1910 Acts upon surplus lands on the Tribe's reservation. Accordingly, the Tribe acquired no title to the CBM gas when, in 1938, under authority of the IRA, the United States restored the coal to the Tribe.

9

*Id.* at 1151-52; *accord id.* at 1146; *see also See Southern Ute Indian Tribe v. Amoco Prod. Co.*, Case No. 91-B-2273, Case Management Order No. 1 at ¶ 3 (April 24, 1992) ("This action shall be maintained as a class action on behalf of the Certified Class solely as to (a) the determination of ownership of coalbed methane located in or near coal reserved by the United States in patents issued under the Act of March 3, 1909, Ch. 270, 35 Stat. 844 (codified as 30 U.S.C. § 81) or under the Coal Lands Act of 1910, Ch. 318, 366 Stat. 583 (codified as 30 U.S.C. § 83-85) . . . .").

Compare this to Farmer's instant suit generally. Farmer's claimed ownership of the CBM gas and the ownership it alleges the Tribe now claims derive solely from the oil and gas estate reserved in the Cameron Deed and the facts germane thereto–namely, whether that estate was perpetuated. Yet the above shows that neither the Cameron Deed generally, nor ownership of CBM gas or the larger oil and gas estate flowing from that deed specifically, was raised, examined, or settled in *Amoco*. Farmer was not even a defendant in *Amoco*. Whether Farmer owns (or, put as Farmer does, that the Tribe does *not* own) the 80-Acre Tract's CBM gas because of that deed's perpetuated reserved mineral estate thus patently falls outside *Amoco*'s ambit. Contrary to Farmer's insistence, then, this case is not "reasonably incident" to *Amoco*. *See United States v. Martin*, 267 F.2d 764, 769 (10th Cir. 1959) ("[W]hen the United States institutes a suit, it thereby consents by implication to the full and complete adjudication of all matters and issues which are reasonably incident thereto."). Comparing *Amoco* to Farmer's specific claims underscores this determination.

Farmer's first claim for relief seeks a declaration that *Amoco* held that the Tribe did not under any theory own the CBM gas beneath the 80-Acre Tract as of March 22, 2000, but the above shows that *Amoco*'s holding was not so broad or categorical. It held only that the Tribe did not own the CBM gas *by virtue of owning the coal that the United States restored to it in 1938*. Whether the

Tribe owned the CBM gas on some other grounds was left unexamined. Indeed, the pleadings in *Amoco* did not address, nor was any party to the case permitted to address, ownership claims deriving from outside the context of the Coal Lands Act and the patents issued thereunder. *See Amoco*, Case No. 91-B-2273, Case Management Order No. 1 at ¶ 3. Farmer's second claim for relief seeks a declaration that the Tribe's asserted ownership of the 80-Acre Tract's CBM gas based on a terminated reserved mineral interest in the Cameron Deed is without merit and frivolous. But again, the Tribe did not assert, nor did *Amoco* examine or decide, that issue. And whether the Tribe agreed to communitize the 80-Acre Tract's CBM gas with adjacent tribal minerals was patently not part of that case. Farmer's claims are therefore not within *Amoco*'s scope.

**2**

I now turn to the PSA to determine whether Farmer's instant action falls within its boundaries. Common law contract principles govern the interpretation of settlement agreements such as the PSA. *See, e.g.*, *Yaekle v. Andrews*, 195 P.3d 1101, 1107 (Colo. 2008). "The primary goal of contract interpretation is to determine and effectuate the intent and reasonable expectations of the parties." *Copper Mountain, Inc. v. Industrial Systems, Inc.*, 208 P.3d 692, 697 (Colo. 2009). To determine the parties' intent, I should give effect to the plain and generally accepted meaning of the contractual language. *Id*. That means interpreting a contract "in its entirety with the end in view of seeking to harmonize and to give effect to all provisions so that none will be rendered meaningless" and examining "the entire instrument and not by viewing clauses or phrases in isolation." *Id.* (internal quotations omitted). With these precepts, I turn to the PSA.

**(a)**

Section 3.01 delineates the PSA's scope: "This Agreement affects only the Interests of Palo,

and the interests of the parties ratifying this Agreement in accordance with Sections 9.01 and 9.02, . . . in the Lands." *See* PSA § 3.01. "Lands" is defined as "certain lands within the [Tribe's reservation], such lands being more fully described on Appendices I and IA attached hereto (to the extent of Palo's Interest therein . . . .)." *Id.* at 1, Recitals.  Appendix I lists the S/2SW/2 portion of Section 35, Township 33, the section containing the 80-Acre Tract. *See* PSA Appendix I. "Interests" is defined as "certain oil and gas interests (excluding any interests in properties held by Palo under Tribal leases or through third parties tracing their title to Tribal leases . . . .)." *Id.* at 1, Recitals.

Reading these definitions into section 3.01 elucidates the PSA's contours. With respect to the various parties' property interests, the PSA encompasses Palo's oil and gas interests in the Tribe's lands. It also encompasses an interest that a ratifying party has in a tract of land within the Tribe's reservation, but only if Palo has an oil and gas interest in that same tract. Hence, if a ratifying party had an interest in a particular parcel of land within the Tribe's reservation–such as title to the parcel's mineral estate–but Palo did not have an oil and gas interest in that parcel, the ratifying party's interest in that parcel was not subject to the PSA. With respect to the land that fell within the PSA's scope, the agreement encompassed only those lands within the Tribe's reservation in which Palo had an oil and gas interest.  Therefore, if Palo did not have an oil and gas interest in a particular tract of land, that land was not subject to the PSA, nor was any interest associated with it.  This makes sense, as the PSA was an agreement between Palo and the Tribe. With the PSA's boundaries traced, I turn to whether Farmer's instant action is found inside them.

**(b)**

One way to approach whether the instant action falls within the PSA's scope is as the parties do: by determining whether the 80-Acre Tract is subject to the PSA. As the claims flow from that

tract of land, if the PSA does not encompass that tract, it would seem to follow that the PSA also does not encompass Farmer's claims. Pursuing this approach, based on Part III.A.1.a, *supra*, the inquiry is whether Palo had an oil and gas interest in the 80-Acre Tract.

The parties do not dispute that Palo lacked an oil and gas interest in the 80-Acre Tract when the PSA was executed. At that time Palo had only a top-lease. Accordingly, I conclude that at the time the PSA was executed, the 80-Acre Tract did not fall within the PSA's scope.

This is consonant with the rest of the PSA. The 80-Acre Tract is specifically addressed in only one provision of the PSA: section 8.07. That section states that

> Palo operates the Palo Southern Ute 35-1 Well, presently located on a 240-acre unit. *In the event that certain 80-acre tract (described in Appendix I) is communitized into said unit, the Tribe agrees that such tract shall be subject to this Settlement Agreement to the extent of Palo's interest therein.*

PSA § 8.07 (emphasis added).  The parties agree that the "80-acre tract" in section 8.07 refers to the 80-Acre Tract. "In the event" is conditional language evincing that the PSA does not apply to the 80-Acre Tract unless and until the Tribe agrees to communitize it with the surrounding 240 acres in Section 35. By the PSA's terms and definitions, this also means that the PSA does not apply to the tract's CBM gas. Hence, a plain reading of section 8.07 buttresses my determination that the 80-Acre Tract was not subject to the PSA when it was executed. No other provision is discordant.

My inquiry, however, does not end here because Farmer asserts that the 80-Acre Tract *has become* subject to the PSA through various mechanisms. Farmer first relies on section 10.01. That section states that "[t]his Agreement shall inure to the benefit of, and shall be binding upon, the respective lawful successors and assigns of (i) the Tribe and Palo and (ii) the Prior Interest Owners, to the extent they are affected by this Agreement."  PSA § 10.01. Relying on the property law doctrine of merger, *see Colorado National Bank-Exchange v. Hammar*, 764 P.2d 359, 361 (Colo.

App. 1988), Farmer maintains that when Palo's top-lease of the 80-Acre Tract terminated in 2009, that interest merged into its ownership of the 80-Acre Tract's CBM gas, making Farmer Palo's successor-in-interest by operation of law. Pl.'s Resp. at 14. Alternatively, Farmer argues that even if the two interests did not merge, Farmer's predecessor-in-interest ratified the PSA, meaning that all the PSA's benefits flowed to them.

This argument is untenable as it ignores section 3.01's circumscription and distorts section 10.01. Assuming, *arguendo*, that in 2009, Palo's top-lease to the 80-Acre Tract indeed merged with Farmer's asserted interest in the 80-Acre Tract's CBM gas, that does not bring the 80-Acre Tract within the PSA's scope because Palo still lacks an oil an gas interest in that tract. Per section 3.01, for that tract to be subject to the PSA, *Palo* must have an oil and gas interest in it; *Farmer*'s interest is irrelevant. Put another way, by the terms of the PSA, whether the 80-Acre Tract was subject to the PSA was predicated upon whether Palo had an oil and gas interest in it–not whether Farmer does. Farmer's proffered interpretation of section 10.01 would effectively require reading in the italicized language into section 3.01:  "This Agreement affects only the Interests of Palo *and its successors and assigns*, and the interests of the parties ratifying this Agreement in accordance with Sections 9.01 and 9.02, . . . in the Lands."  This runs counter to basic principles of contract interpretation.  Section 10.01 does not expand or otherwise modify the scope of the PSA or replace "Palo" with everyone one of its assignees and successors. Nor does it append "and its successor and assigns" after every use of "Palo."  To the contrary, the section explicitly states that Farmer, as Palo's successor, is bound by the PSA, which would include the scope delineated in section 3.01. My interpretation of section 10.01 is fortified by the fact that elsewhere the PSA explicitly expands certain provisions to include Palo's successors and assigns.  *See, e.g.*, PSA § 6.01 (The Tribe does

hereby release, waive and discharge Palo, *its successors, assigns*, . . . from any and all claims . . . .") (emphasis added).  Farmer's reading thus not only flouts section 10.0, but it also leads to inconceivable corollaries.  One of which is that it makes the PSA's scope terminally ebb and flow with the "Interests" of each of Palo's successors or assignees. In this way it also disregards the fundamental concept of privity of contract by forcing the Tribe to contract with unknown, unforeseen actors who were not parties to the PSA. This cannot be what the parties intended. These defects apply equally to Farmer's alternative argument that its predecessor ratified the PSA.

Farmer next cites section 3.01 in support of its contention that the 80-Acre Tract is subject to the PSA because Farmer's predecessor in interest ratified it. My interpretation of section 3.01, *supra*, shows that this argument dies before it is even born because Farmer fails to demonstrate that Palo had an oil and gas interest in that tract.  *See* Part III.A.1.a, *supra*.

Farmer's final argument for why its instant action falls within the scope of the PSA is that section 8.07 "reflects the parties' agreement that after the [*Amoco*] case, upon a determination that the Tribe did not prevail on its claim" the 80-Acre Tract, through a distinct, separate agreement, would be communitized with the surrounding acreage that was subject to the PSA, thereby bringing the 80-Acre Tract within the PSA's scope.  *See* Pl.'s Resp. at 24. It alleges that on October 16, 1991, the Bureau of Land Management sent Palo a letter stating that federal regulations required the communization of the 80-Acre Tract with the surrounding 240 acres.  *See* Pl.'s Resp. at 23. That letter directed Palo to submit an approvable communitization agreement to the Bureau of Indian Affairs. *See id.* Ex. 8 at 7.

With this argument, Farmer does an about-face without explanation. Farmer's third claim asserts that the PSA *itself*–not some other agreement–required the Tribe to communitize the 80-Acre

*Tract with the surrounding 240 acres. See* Pl.'s First Am. Compl. at 13, ¶ 54 ("Farmer asserts that *under the terms of the [PSA] and Ratification,* the Tribe agreed to the communitization of the [80-Acre Tract's CBM gas] with the 240-acre tract . . . ."); *see also id.* at 2, ¶ 5 (alleging that I "approved [the PSA] *in which* the Tribe agreed to communitize" the CBM gas underlying the 80-Acre Tract) (emphasis added). In any event, this new argument also fails. Farmer concedes that an approvable communitization agreement was never submitted and approved, and it fails to persuade me that approval of such an agreement, as well as meeting other federally-prescribed requirements for communitization agreements, is unnecessary. *See, e.g.*, 25 C.F.R. § 211.28 ("(a) For the purpose of promoting conservation and efficient utilization of minerals, the Secretary may approve a cooperative unit, drilling or other development plan on any leased area upon a determination that approval is advisable and in the best interest of the Indian mineral owner. . . . (c) Requests for approval of cooperative agreements which comply with the requirements of all applicable rules and regulations shall be filed with the superintendent or area director. . . . (e) A request for approval of a proposed cooperative agreement, and all documents incident to such agreement, must be filed with the superintendent or area director at least ninety (90) days prior to the first expiration date of any of the Indian leases in the area proposed to be covered by the cooperative agreement."). Farmer also ignores the plain language of section 8.07, which provides that if a communitization agreement for the 80-Acre Tract was submitted, that tract would still only have been subject to the PSA "to the extent of Palo's interest therein."  PSA § 8.07.  Even assuming that a communitization agreement was submitted, the 80-Acre Tract would not have been subjected to the PSA after Palo's top-lease interest in the tract expired in 2009, as that was Palo's only interest in the tract.  For the same reasons articulated above, Farmer's arguments that it is the successor-in-interest to Palo's expired

lease and that its predecessor ratified the PSA do not change this.

Accordingly, I conclude that Farmer fails to establish that the 80-Acre Tract falls within the PSA's scope. Nothing in the Ratification demonstrates otherwise.

**(c)**

To determine whether Farmer's instant action falls within the scope of the PSA, I could use a different approach: I could assess whether Farmer's claims are found within the PSA. They are not.

As stated, Farmer's first claim for relief seeks a declaration that *Amoco* held that the Tribe did not under any theory own the CBM gas beneath the 80-Acre Tract as of March 22, 2000. Its second claim seeks a declaration that the Tribe's asserted ownership of the 80-Acre Tract's CBM gas based on a terminated reserved mineral interest in the Cameron Deed is without merit and frivolous. It is clear from the above that these two claims are not covered by the PSA. The 80-Acre Tract is not subject to the PSA. And, of course, the PSA was executed before *Amoco* was decided. The PSA also does not address the Cameron Deed, which is the basis for Farmer's alleged ownership and the Tribe's asserted ownership that Farmer seeks to quash with this action.

Farmer's third claim likewise falls beyond the PSA's scope. Relying on section 8.07, that claim seeks a declaration that "in the" PSA and Ratification, the Tribe agreed to communitize the 80-Acre Tract with the surrounding acreage that was subject to the PSA.  That section does not require that the 80-Acre Tract be communitized at all, let alone by the Tribe.  "In the event" is conditional language that does not oblige the Tribe to communitize. Section 8.07 merely allows for communitization of that tract and prescribes its effect. Farmer implicitly concedes this in its response. *See* Part III.A.2.b, *supra*. No other section in the PSA addresses communitization or the

80-Acre Tract. Farmer's third claim thus falls outside the PSA.

Accordingly, I conclude that Farmer fails to establish that any of its three claims fall within the PSA's scope. Nothing in the Ratification demonstrates otherwise.

**B**

Armed with these determinations, I now turn to the parties' specific arguments. The Tribe's principle contention is that it has sovereign immunity from this suit. It further argues that Farmer's claims fail to raise a federal question and that ancillary jurisdiction is absent.

Farmer opposes and argues the following. *Amoco*, under the doctrine of *res judicata*, and the PSA bar the Tribe from claiming that its owns the 80-Acre Tract's CBM gas. *Amoco* also waived the Tribe's immunity from its first claim, and the PSA waived the Tribe's immunity from its first and third claims. Ancillary jurisdiction exists over its first claim under *Amoco* and the PSA. Lastly, while its second claim is a state law action, I should nevertheless exercise supplemental jurisdiction over it should I determine that jurisdiction over the first or third claim exists.

I begin with whether the Tribe has sovereign immunity from the instant suit because sovereign immunity trumps federal-question jurisdiction. *See Miner Elec., Inc. v. Muscogee (Creek) Nation*, 505 F.3d 1007, 1011(10th Cir. 2007) ("We disagree that federal-question jurisdiction negates an Indian tribe's immunity from suit. Indeed, nothing in § 1331 unequivocally abrogates tribal sovereign immunity. . . . [I]n an action against an Indian tribe, we conclude that § 1331 will confer subject matter jurisdiction where another statute provides a waiver of tribal sovereign immunity or the tribe unequivocally waives its immunity."). I then address whether, as Farmer asserts, *Amoco* or the PSA bar the Tribe from claiming ownership of the 80-Acre Tract's CBM gas. Lastly, I turn to federal question, ancillary, and supplemental jurisdiction.

18

**1**

"Indian tribes are domestic dependent nations that exercise inherent sovereign authority over their members and territories.  As an aspect of this sovereign immunity, suits against tribes are barred in the absence of an unequivocally expressed waiver by the tribe or abrogation by Congress." *Fletcher v. United States*, 116 F.3d 1315, 1324 (10th Cir. 1997); *accord Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 58 (1978). The Tribe asserts that its sovereign immunity bars Farmer's claims. Because Farmer has the burden of showing that subject matter jurisdiction exists, *see Montoya*, 296 F.3d at 955, it bears the burden of showing that the Tribe unequivocally and expressly waived its immunity. *See, e.g.*, *James v. United States*, 970 F.2d 750, 753 (10th Cir. 1992). (Farmer does not submit that the Tribe's immunity was abrogated by Congress.) Farmer argues that the Tribe waived its sovereign immunity in three ways; I address these in turn.

**(a)**

Farmer articulates various formulations of its first waiver argument. It initially states that the Tribe's sovereign immunity argument is "without merit" because Farmer "is merely seeking a judicial determination regarding the scope of this Court's decision in the [*Amoco*] case that the Tribe initiated."  Pl.'s Resp. at 17. Next, "the Tribe unequivocally expressed a waiver of its sovereign immunity with respect to the issue of its ownership of the [80-Acre Tract's CBM gas] that it presented for adjudication by filing the [*Amoco*] Case in federal court." *Id.*  Then, "[b]ecause Farmer is merely asking the Court to issue a declaratory judgment defining the contour and scope of its decision in the [*Amoco*] case, the Tribe, having initiated that case, cannot now assert that it enjoys sovereign immunity to bar this Court from making a determination that is necessary to ensure that there was a full and complete adjudication of the issues reasonably incidental to that case." *Id.*

These numerous articulations aside, they all allege waiver only as to Farmer's first claim for relief. They all also posit that *Amoco* not only included a decision that the Tribe did not own the CBM gas by virtue of owning the coal, but also that it held that Tribe did not own that gas under *any* legal theory available at the time the Tribe filed the case. *Id.* at 17.

Regardless of how Farmer frames this argument, it has numerous defects. It mischaracterizes Farmer's first claim. That claim does not seek a declaratory judgment defining *Amoco*'s scope in the broad sense; it seeks the more specific declaratory judgment that *Amoco* held that the Tribe did not own the 80-Acre Tract's CBM gas as of March 22, 2000. *Compare* Pl.'s Resp. at 17-18, *with* First Am. Compl. at 14.   Additionally, the assertion that the Tribe's sovereign immunity is waived or is otherwise inapplicable because Farmer is "merely seeking a judicial determination regarding the scope of this Court's decision in [*Amoco*]" is devoid of legal support.   Fatally, my analysis in Part III.A.1, *supra*, also shows that the argument is premised on an erroneously broad construction of *Amoco*.   The case only decided that because the Coal Lands Acts did not reserve CBM gas when they reserved "coal" in the United States, the Tribe did not own the CBM gas by virtue of owning the coal.   *Amoco* did not examine ownership claims over the CBM gas deriving from other sources.   For the reasons discussed in Part III.A.1, *supra*, Farmer's first claim therefore falls outside *Amoco*'s scope. This argument thus fails to show that by filing *Amoco,* the Tribe unequivocally and expressly waived its sovereign immunity as to Farmer's first claim.

### (b)

Farmer next argues that by filing suit in *Amoco*, the Tribe waived its sovereign immunity in a second way. It contends that by seeking to quiet title to the CBM gas in that case, the Tribe waived its sovereign immunity as to counterclaims that sound in recoupment. While I agree with Farmer's

20

articulation of the law, I disagree that it applies here.

The Tenth Circuit has held that "when a[n] [Indian] tribe files suit it waives its immunity as to counterclaims of the defendant that sound in recoupment." *Berrey v. Asarco Inc.*, 439 F.3d 636, 643 (10th Cir. 2006) (citing *Jicarilla Apache Tribe v. Andrus*, 687 F.2d 1324, 1344 (10th Cir. 1982)). *Jicarilla* was the first case to so hold. It explained the contours of this exception to tribal sovereign immunity in the following way:

> when the sovereign sues it waives immunity as to claims of the defendant which assert matters in *recoupment-arising out of the same transaction or occurrence which is the subject matter of the government's suit*, and to the extent of defeating the government's claim but not to the extent of a judgment against the government which is affirmative in the sense of involving relief different in kind or nature to that sought by the government or in the sense of exceeding the amount of the government's claims; *but the sovereign does not waive immunity as to claims which do not meet the "same transaction or occurrence test" nor to claims of a different form or nature than that sought by it as plaintiff* nor to claims exceeding in amount that sought by it as plaintiff.

687 F.2d at 1344 (quoting *Frederick v. United States*, 386 F.2d 481, 488 (5th Cir. 1967)) (emphases added). In *Jicarilla*, the Tenth Circuit affirmed the district court's dismissal of counterclaims asserted against the plaintiff-Indian tribe because the events from which the counterclaims arose occurred well after the transactions underlying the Indian tribe's initial lawsuit. *Id.* at 1345.

I conclude that Farmer's instant action does not meet *Jicarilla*'s requirements to qualify as an exception to the Tribe's sovereign immunity. In the first instance, Farmer is the plaintiff here, meaning its first claim is not a "counterclaim" at all. In that same vein, unlike in *Jicarilla*, Farmer is not asserting the claim in the same action in which the Tribe filed suit.  Assuming, *arguendo*, that its first claim could be construed as a counterclaim, my analysis in Part III.A.1, *supra*, shows that Farmer's claim here simply does not arise from the "same transaction or occurrence" that was the subject of the Tribe's suit in *Amoco*.  In *Amoco*, the prior interest owners based their claims of

ownership over the CBM gas on patents issued under the Coal Lands Acts. The Tribe asserted that it owned the CBM gas by virtue of owning the coal that was first reserved in the United States in 1909 or 1910 under those acts and was then restored to the Tribe in 1938. *Amoco* involved, and the ownership turned on, construing the Coal Lands Acts to determine whether Congress intended to reserve CBM gas when it reserved the "coal."

By contrast, here, the ownership dispute over the 80-Acre Tract's CBM gas derives from a distinct conveyance and instrument–the Cameron Deed–executed 30 years after the patent to the 80-Acre Tract was first issued.  This action would thus involve examining only a private deed and whether the oil and gas reservation therein has been perpetuated, not the Coal Lands Acts or ownership of coal. And whether the oil and gas reservation was perpetuated involves facts and evidence beginning from, at the latest, 1966 and running through today, thus dragging this action further and further from *Amoco* spatially and temporally.  For these reasons, to say that Farmer's claims here arise from the "same transaction or occurrence" as the Tribe's in *Amoco* strains the phrase beyond its limits. This argument therefore fails to establish an unequivocal and express waiver of the Tribe's sovereign immunity as to Farmer's instant action.

(c)

Farmer's third and final waiver argument is that "the Tribe waived it sovereign immunity defense with respect to Farmer's claims because these claims require the Court to interpret the [PSA]." Pl.'s Resp. at 20.  I note here that, vis-a-vis the previous two waiver arguments, Farmer contends that this waives the Tribe's sovereign immunity from its first and third claims. *See* Pl.'s Resp. at 2 ("[I]n order to evaluate the *bona fides* of Farmer's *first and third claims* for relief, the Court must interpret the Settlement Agreement.") (emphasis added).

22

Farmer cites *Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375 (1994), for the proposition that "[a] district court possesses ancillary jurisdiction to enforce a settlement agreement post-dismissal if the court expressly retains jurisdiction or incorporates the agreement in its order of dismissal." Pl.'s Resp. at 20. Farmer explains that in section 11.02 of the PSA, the Tribe expressly agreed "to unequivocally submit to the jurisdiction of [this] Court, which shall have, to the extent the parties can so provide, original and exclusive jurisdiction . . . over all matters of interpretation or enforcement of this Agreement . . . ." *Id.* (quoting PSA at 12, § 11.02). It further explains that I approved the PSA and incorporated it as part of my order dismissing the Tribe's claims against Palo with prejudice. Thus, Farmer concludes, the Tribe waived its sovereign immunity, and I have ancillary jurisdiction under *Kokkonen* over its first and third claims.

The Tribe readily acknowledges that, as part of the PSA, it expressly waived its sovereign immunity so the Court could interpret and enforce the settlement. Its position, however, is that this waiver extends only to matters actually within the scope of the PSA. Stated differently, the Tribe argues that its waiver in section 11.02 did not waive its sovereign immunity from suits falling outside the PSA. And it contends that Farmer's entire suit is beyond the PSA's scope.

I conclude that interpreting the PSA does not waive the Tribe's sovereign immunity. First, Farmer's reliance on *Kokkonen* is misplaced. *Kokkonen* is legally and factually distinguishable because it addressed only ancillary jurisdiction, not sovereign immunity and waiver. *See* 511 U.S. 375. Furthermore, *Kokkonen* does not state that merely having to interpret a settlement agreement from an earlier suit in a subsequent action creates jurisdiction over the latter. *See id.* Farmer fails to cite any other legal authority in support of that proposition. More importantly, Farmer puts the cart before the horse: ancillary jurisdiction does not exist where an Indian tribe has sovereign

immunity from the suit. *See Presidential Gardens Associates v. United States*, 175 F.3d 132, 140

(2nd Cir. 1999); *see also McKay v. United States*, 207 Fed. App'x 892, 895-96 (10th Cir. 2006)

(unpublished).

Second, Farmer's quotation of section 11.02 of the PSA is conveniently incomplete. In its

entirety, section 11.02 provides the following:

> In the event that any legal proceeding related to the interpretation or enforcement of
> this Agreement or of the documents contemplated herein is initiated by any party, *the
> Tribe agrees to a limited waiver of the defense of sovereign immunity in order that
> the legal proceeding shall be heard and decided in accordance with the terms hereof.
> The Tribe specifically surrenders its sovereign power to the extent necessary to
> effectuate the terms of this agreement* and to unequivocally submit to the jurisdiction
> of th[is] Court, which shall have, *to the extent the parties can so provide*, original
> and exclusive jurisdiction as contemplated in this paragraph, over all matters of
> interpretation or enforcement of this Agreement, the Minerals Agreement or any
> other documents to be delivered hereunder, and any assignment thereof made by Palo
> which the parties acknowledge arise under the Indian Mineral Development Act of
> 1982, the Act of June 18, 1934, 48 Stat. 984 and/or the Act of May 11, 1938, 52 Stat.
> 347.

PSA at 12, § 11.02 (emphases added). Farmers omits the italicized language, and yet it is this

language that is the Tribe's waiver. The italicized language does not unequivocally and expressly

show that the Tribe waived its sovereign immunity from suits falling *outside* the PSA's scope; and

that is what the provision would need to convey to support Farmer's position because if a matter

must fall within the PSA's scope for the waiver to apply, merely interpreting the PSA would not be

enough. Such a reading is discordant with the cabining phrases "limited waiver, to the extent

necessary, to the extent the parties can do provide."  Moreover, a matter beyond the PSA could not

be resolved "in accordance with the terms" of the PSA, nor could the agreement's terms be

"effectuated" with respect to that matter. Farmer's argument thus renders these phrases superfluous.

That weighs heavily against waiver here.

Beyond just the countervailing textual evidence, theoretical implications militate against adopting Farmer's argument.  For example, Palo could file a civil conspiracy claim against the Tribe that is completely unrelated to the *Amoco* case and allege that the Tribe waived its sovereign immunity from the suit in the PSA.  The court would naturally turn to the PSA to determine whether the Tribe indeed waived its sovereign immunity from civil conspiracy suits.  Insodoing, if one subscribes to Farmer's argument, the Tribe's sovereign immunity has been waived. This is an absurd result both theoretically and within the textual confines of section 11.02.

Accordingly, I conclude that Farmer fails to show that the Tribe expressly and unequivocally waived its sovereign immunity from the instant suit.

**2**

Curiously, that the Tribe waived its sovereign immunity is not Farmer's leading argument in its response.  Farmer instead first argues that *Amoco* and the PSA each bar the Tribe from claiming that it has owned the 80-Acre Tract's CBM gas since May 27, 1966. I address these in turn.

Before doing so, however, I note that because Farmer fails to show waiver by the Tribe, I am uncertain that I need to address these arguments. *See, e.g.*, *Franklin v. Savings Corp.*, 385 F.3d 1279, 1286 (10th Cir. 2004) ("Jurisdictional issues must be addressed first and, if they are resolved against jurisdiction, the case is at an end.  In contrast, res judicata is *not* a jurisdictional bar; it is an affirmative defense, and, thus, would not defeat subject matter jurisdiction of this or the district court.") (internal citations and quotations omitted).  I am therefore leery of doing so, but two things persuade me. The first is the peculiar way in which Farmer seeks to use *res judicata* and the PSA. As plaintiff, Farmer is not seeking to assert them as an affirmative defense, as a shield, but as a claim, as a sword.  It also appears to be using them to establish jurisdiction. The second is that the

substance of Part III.B.2, *infra*, is not new; it is essentially Part III.A rehashed in a slightly different context.

(a)

Farmer argues that under the doctrine of *res judicata*, *Amoco* "encompassed any other claim to the [80–Acre Tract's CBM gas] that the Tribe had at the time it filed [*Amoco*]." Pl.'s Resp. at 8. Therefore, Farmer contends, *Amoco* bars the Tribe from asserting that it has owned the 80-Acre Tract's CBM gas since May 27, 1966, pursuant to the Cameron Deed. Farmer later uses this as a basis for arguing that ancillary jurisdiction exists.

Farmer's argument is untenable. As stated, I am unconvinced that it is using *res judicata* properly. That doctrine is not a jurisdictional issue; it is an affirmative defense, and "[j]urisdictional issues must be addressed first and, if they are resolved against jurisdiction, the case is at an end." *See Franklin*, 385 F.3d at 1286. Thus, whether *Amoco*'s *res judicata* effect bars the Tribe's ownership claim here can only be decided once Farmer establishes that I have jurisdiction over its claims, which it has not done.

Nevertheless, Farmer also fails to show the elements of *res judicata*. In the Tenth Circuit, *res judicata* or claim preclusion "applies when three elements exist: (1) a final judgment on the merits in an earlier action; (2) identity of the parties in the two suits; and (3) identity of the cause of action in both suits." *MACTEC, Inc. v. Gorelick*, 427 F.3d 821, 831 (10th Cir. 2005). If these elements exist, "res judicata is appropriate unless the party seeking to avoid claim preclusion did not have a 'full and fair opportunity' to litigate the claim in the prior suit." *Id.* (quoting *Yapp v. Excel Corp.*, 186 F.3d 1222, 1226 n.4 (10th Cir. 1999)). In determining what constitutes a "cause of action" for preclusion purposes, I use the "transactional approach." *Id.* at 832. "Under this

26

approach, a cause of action includes all claims or legal theories that arise from the same transaction. A contract is generally considered to be a 'transaction' for claim preclusion purposes." *Id.* More specifically, "transaction" "connotes a natural grouping or common nucleus of operative facts." *Restatement (Second) of Judgments § 24*, at 199 (1982). Factors relevant to determining "whether the facts are so woven together as to constitute a single claim are their relatedness in time, space, origin or motivation, and whether, taken together, they form a convenient unit for trial purposes." *Id.*

My discussion in Part III.A.1, *supra*, applies equally here and shows that the Tribe's claim in *Amoco* and the ownership claim involved here are not from the same transaction. I incorporate that discussion by reference. *See* Part III.A.1, *supra*. It bears repeating that in *Amoco*, the origin of the Tribe's ownership claim was its ownership of coal that was reserved in and by the United States in patents issued under the Coal Lands Acts and which was later restored to the Tribe in 1938. And *Amoco* held only that the Tribe did not own the CBM gas by virtue of owning that coal. In comparison, the origin of the Tribe's ownership claim at issue here is the Cameron Deed, a distinct contract that was not at issue in *Amoco* and that was executed by private parties over 35 years after the Coal Lands Acts. Moreover, the facts pertaining to the Tribe's ownership claim in the instant action are alien in time and type to those in *Amoco*. Involving the disputed perpetuation of the Cameron Deed's terminable mineral estate, they would date at least to the late 1960's and could stretch through today. *Amoco*'s dispositive facts flow from 1909 and 1910.

Farmer also neglects the limitations on *res judicata* in the class action context.

The class-action was device was intended to establish a procedure for the adjudication of common questions of law or fact. . . . Indeed, Rule 23 is carefully drafted to provide a mechanism for the expeditious decision of common questions. Its purposes might well be defeated by an attempt to decide a host of individual

claims before any common question relating to liability has been resolved . . . .

*Cooper v. Federal Reserve Bank of Richmond*, 467 U.S. 867, 880-81 (1984). To be sure, "[t]here is of course no dispute that under elementary principles of prior adjudication a judgment in a properly entertained class action is binding on class members in any subsequent litigation." *Id.* at 874. A judgment in favor of either side in a class action, however, "is conclusive in a subsequent action between them *on any issue actually litigated and determined*, if its determination was essential to that judgment." *Id.* (emphasis added).  It was settled in Part III.A.1, *supra*, that the issue of whether the Tribe (or Farmer, for that matter) owns the 80-Acre Tract's CBM gas pursuant to the Cameron Deed was not "actually litigated and determined" in *Amoco*.  For these reasons, and for those in Part III.A.1, that case simply does not have the *res judicata* effect that Farmer purports.

**(b)**

Farmer also argues that the PSA bars the Tribe from claiming that it has owned the 80-Acre Tract's CBM gas since May 27, 1966.  In support, Farmer cites a host of provisions through which it argues the 80-Acre Tract became subject to the PSA.  *See* PSA §§ 3.01, 10.01. Farmer then insists that section 9.01 of the PSA and paragraph 2(a) of the Ratification bar the Tribe from asserting it has owned the 80-Acre Tract's CBM gas since May 27, 1966, pursuant to the Cameron Deed.

I again disagree with Farmer. In Part III.A.2, *supra*, I dealt with Farmer's arguments concerning whether the 80-Acre and its CBM gas are subject to the PSA, including sections 3.01 and 10.01, and I concluded they are not. And nowhere in the PSA or Ratification did the Tribe agree to Farmer's claims pursuant to the Cameron Deed.  Section 9.01 of the PSA and paragraph 2(a) of the Ratification also do not lend Farmer succor.  In section 9.01, the Tribe agreed, *inter alia*, "not to maintain any action against such Prior Interest Owner to recover . . . royalties or Tribal severance

taxes received or attributable to the production of Coalbed Methane from such Lands . . ." PSA §

9.01. Paragraph 2(a) of the Ratification mirrored this covenant. Both provisions rely on the PSA's

definition of "Lands," but because Palo never had an oil and gas interest in the 80-Acre Tract,

"Lands" did not include that tract.   *See* PSA at 1, Recitals; *see also* Part III.A.2, *supra*.

Consequently, I conclude that the PSA does not have the preclusive effect that Farmer submits.

**3**

The parties marshal additional arguments concerning jurisdiction. The Tribe asserts that

Farmer's claims fail to raise a federal question. In a suit against an Indian tribe, federal-question

jurisdiction can only exist "where another statute provides a waiver of tribal sovereign immunity or

the tribe unequivocally waives its immunity." *Miner Elec.*, 505 F.3d at 1011.   Assuming that

federal-question jurisdiction exists, it would not negate an Indian tribe's sovereign immunity from

suit. *Id.* Thus, a federal question cannot support jurisdiction against an Indian tribe where that tribe

has sovereign immunity from the suit.

The parties also dispute whether ancillary jurisdiction exists over Farmer's first or third

claims. Ancillary jurisdiction "recognizes federal courts' jurisdiction over some matters (otherwise

beyond their competence) that are incidental to other matters properly before them." *Kokkonen*, 511

U.S. at 378. "Whether ancillary jurisdiction exists, however, has no impact whatsoever on the issue

of sovereign immunity or its waiver. . . . [S]overeign immunity still bars such claims from being

brought against the government absent a waiver, . . ." *Presidential Gardens*, 175 F.3d at 140. This

is true even if ancillary jurisdiction is present.   *Id.*; *see also McKay*, 207 Fed. App'x at 895-96

(affirming district court's dismissal of suit for lack of jurisdiction because district court could not

assert ancillary jurisdiction over a settlement agreement and could not otherwise exercise

jurisdiction to order specific performance thereof in the absence of a waiver of sovereign immunity).

Farmer lastly argues that supplemental jurisdiction exists over its second claim. Supplemental jurisdiction is likewise a moot issue if an Indian tribe has sovereign immunity from suit. *See* 28 U.S.C. § 1367(a) ("Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, *in any civil action of which the district courts have original jurisdiction*, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.") (emphasis added); *see also Wisconsin v. Ho-Chunk Nation*, 512 F.3d 921, 936 (7th Cir. 2008) ("While federal jurisdiction exists with respect to all the State's remaining causes of action, the Nation's sovereign immunity still barred these claims from being brought against it unless this immunity had been waived by the tribe or 'unequivocally' abrogated by Congress. The Supreme Court has held that Congress did not abrogate state sovereign immunity in the Supplemental Jurisdiction Act, and we find no indication Congress intended a contrary result with respect to tribal sovereign immunity under this statute. . . . Thus, the district court's ability to hear these remaining claims depends upon whether the Nation has waived its sovereign immunity.") (internal citations omitted).

Because Farmer fails to show that the Tribe unequivocally and expressly waived its sovereign immunity from this suit, whether federal question, ancillary, or subject matter jurisdiction exist are issues I need not address to resolve the pending motion.

## IV. Conclusion

For the foregoing reasons, IT IS ORDERED that the Tribe's Motion to Dismiss for Lack of Subject Matter Jurisdiction Pursuant to Fed. R. Civ. P. 12(b)(1) **[Doc # 16]** is GRANTED, and the Tribe is awarded its costs.

Date: October __12__, 2012 in Denver, Colorado.

                                        BY THE COURT:


                                        ____s/Lewis T. Babcock_____
                                        LEWIS T. BABCOCK, JUDGE